IN RE BETTS ET AL.

[No. 10,028.    Filed January 18, 1918.]

MASTER AND SERVANT.—*Workmen's Compensation Act.—Accident Arising Out of Employment.*—Where one employed by a tinner, while riding in the master's wagon to a place where he was doing work for the master, left the vehicle while the horse was being watered, and was struck and killed by an automobile while crossing the street to purchase tobacco, the accident did not arise out of his employment within the meaning of the Workmen's Compensation Act (Acts 1915 p. 392), and his widow and children were not entitled to an award of compensation for his death.

From the Industrial Board of Indiana.

Certified question of law.

Proceedings under the Workmen's Compensation Act in the matter of one Myrtle Betts and others. Certified question of law by the Industrial Board. *Question answered.*

HOTTEL.—The statement of facts certified by said board is as follows: "On the 6th day of October, 1916, and for many years prior thereto, Ebenezer Crompton was engaged in the tinning and furnace repair business in the city of Indianapolis * * *; that during all of said period he maintained a shop and place of business in Fort Wayne avenue in said city; that for the purpose of transporting his employes and material from his place of business to * * * where they worked, and * * * back to his place of business, the said Crompton maintained and furnished to his employes a wagon and horse; that on and prior to the 6th of October, 1916, one Howell T. Betts was in the employment of the said Crompton in said business at an average weekly wage not exceeding $10.00; that during the period of his employment * * * it was the custom of said

Betts, and other employes with whom he worked, to use the horse and wagon of   *   *   *   said Crompton in going to and returning from their work, not only for the transportation of material but also *   *   * of said employes; that during   *   *   * the employment of   *   *   *   said Betts he returned to Crompton's place of business at the noon hour and   *   *   * generally ate his lunch with his employer; that   *   *   * said   *   *   * Betts was an habitual and almost constant user of tobacco, of which   *   *   * the employer *   *   * had actual knowledge during his employment; that frequently he requested and was furnished small sums by Crompton, between paydays, for the purpose of purchasing tobacco; that on the 6th of October, 1916, *   *   * Betts and   *   *   * Crompton ate their noon lunch together; that after finishing their noon lunch *   *   * Betts informed Crompton that he was out of tobacco and would like to have a quarter   *   *   * to purchase some, whereupon   *   *   * Crompton gave to   *   *   * Betts twenty-five cents for the purpose of purchasing tobacco; that on said date the said Betts and another employe   *   *   * were repairing a furnace on Park avenue between 36th and 37th streets and were using the horse and wagon   *   *   * to transport themselves and material from Crompton's place of business and   *   *   * to his place of business; that immediately after receiving said twenty-five cents   *   *   * Betts and the other employe   *   *   * started to the point where they were repairing said furnace in Crompton's wagon; that they traveled north on Central Ave., which was the direct and proper route for them to take; that upon reaching the intersection of Central avenue and 30th St. the other employe, who was driving the

horse, stopped at the public watering tank at the northeast corner of the intersection  *  *  *  for the purpose of watering Crompton's horse; that just before reaching 30th St., Betts said to his companion 'I want to get off and get some tobacco'; that as the driver stopped the horse at the  *  *  *  tank Betts stepped from the wagon into Central avenue; that immediately across the street and on the west side of Central avenue, a drugstore was situated; that as  *  *  *  Betts stepped from the wagon he faced said drugstore and had taken two or three steps from the wagon, and in the direction of the drugstore, when he was struck by an automobile traveling to the north in Central avenue and killed almost instantly; that the said Betts left surviving him a wife and four children  *  *  *  who were being supported by him; that Crompton had actual knowledge of the death of Betts immediately after it occurred; that the widow makes claim for compensation," etc.

The law question propounded by the board is: "Did the accident resulting in the death of Howell T. Betts arise out of his employment with Ebenezer Crompton?"

This court, within the past year, has had before it numerous cases in which it was required to determine whether a particular accident grew out of the employment in which the injured employe was engaged at the time of his injury, and in those cases it has indicated the general rules applicable and of assistance in the determination of said question. *Haskell, etc., Car Co.,* v. *Brown* (1917), 67 Ind. App. ——, 117 N. E. 555; *Union Sanitary Mfg. Co.* v. *Davis* (1916), 64 Ind. App. 227, 115 N. E. 676; *In re Loper* (1917), 64 Ind. App. 571, 116 N. E. 324; *Holland, etc., Sugar Co.* v. *Shraluka* (1917), 64 Ind. App.

545, 116 N. E. 330; *United Paperboard Co.* v. *Lewis* (1917), 65 Ind. App. 356, 117 N. E. 276; *In re Harraden* (1917), *ante* 298, 118 N. E. 142, and cases there cited.

Little, if anything, of benefit in the determination of such question can be added to what the court has already said in those cases, and we therefore deem it unnecessary to attempt any extended effort to support the conclusion which we have reached in this case. Each case is necessarily, in a large measure, controlled by its own particular facts, and in many cases, as in the present, such facts bring the case within a zone so close to the border line that courts may differ in their judgment as to which side of said line the particular case should be placed. Such cases may be and are in fact, by different courts, placed upon either side of said line, and in each instance respectable authority is cited by the court to uphold its action.

There is a tendency of the courts, indicated in the more recent cases, to give to such compensation acts an interpretation as broad and liberal in favor of the employe as their provisions will permit, in furtherance of the humane purpose which prompted their enactment. We approve and are in sympathy with this tendency, but we understand that all of these cases recognize and in effect hold that: "It is not enough for the applicant to say 'The accident would not have happened if I had not been engaged in that employment or if I had not been at that particular place.' He must go further and must say 'The accident arose because of something I was doing in the course of my employment or because I was exposed by the nature of my employment to some peculiar danger.' " *Craske* v. *Wigan* (1909), 2 K. B. 635;

*Shaw* v. *MacFarlane* (1914), 8 B. W. C. C. 382, 390, 391; *Union Sanitary Mfg. Co.* v. *Davis, supra.* There must be some connection between the injury and the employment other than the mere fact that the employment brought the injured party to the place of injury; that is to say, there must be some causal connection between such employment and the injury in the sense that by reason of the employment there was an increased or additional exposure of the injured party to the kind or character of hazard or danger (in the instant case, a street risk) which caused his injury. The injury must "have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence." *Union Sanitary Mfg. Co.* v. *Davis, supra; Pierce* v. *Provident, etc., Co.* (1911), 1 K. B. 997, 999, 3 N. C. C. A. 279n; *Martin* v. *J. Lovibond & Sons* (1914), 2 K. B. 227, 5 N. C. C. A. 985, 990, and note 5 N. C. C. A. 986 *et seq.; Matter of Glatzel* v. *Stumpp* (1917), 220 N. Y. 71, 114 N. E. 1053.

Of course, it cannot be said that Betts, while on an errand for himself, was doing any service required by his employment, and we are unable to see wherein his employment exposed him to the hazard or danger which resulted in his death. To illustrate our meaning, if the employment of the injured party had been of the kind to take him on a roof, and in going for his tobacco he had slipped, or for any other cause had fallen from the roof and been injured, we can see a connection between the employment and the injury, in that his employment placed him where the hazard of indulging his tobacco was increased. In the instant case the employment did not keep deceased on the street as a pedestrian. If it could be said to expose him to any dangers of the street, other than

to which the public generally is exposed, it was the danger of traveling in a vehicle to and from his work. In other words, as a pedestrian on the street going for his tobacco, his employment exposed him to no danger that would not have been incurred by any other pedestrian on a like errand, nor was he exposed to any hazard different from or in excess of the hazard to which he would have been exposed when on such errand, though he had not been engaged in the employment indicated.

For these reasons, we think the question of law propounded should be answered in the negative. As supporting or tending to support this conclusion, and the grounds upon which it is based, see *Pierce* v. *Provident, etc., Co., supra; Andrew* v. *Failsworth Industrial Society* (1904), 2 K. B. 32; *Martin* v. *J. Lovibond & Sons, supra,* and cases therein cited; *Shaw* v. *McFarlane, supra,* and cases therein cited; *Union Sanitary Mfg. Co.* v. *Davis, supra; McNicol's Case* (1913), 215 Mass. 497, 102 N. E. 697, L. R. A. 1916D 933; *Harbroe's Case* (1916), 223 Mass. 139, 111 N. E. 709, L. R. A. 1916D 933; *Murray* v. *Allen Bros., etc., Co.* (1913), 6 B. W. C. C. 215; *Coronado Beach Co.* v. *Pillsbury* (1916), 172 Cal. 682, 158 Pac. 212, L. R. A. 1916F 1164; *Federal Rubber Mfg. Co.* v. *Havolic* (1916), 162 Wis. 341, 156 N. W. 143, L. R. A. 1916D 968.

Ibach, C. J., and Batman, P. J., concur; Caldwell, J., concurs in result; Felt and Dausman, J. J., dissent.

## DISSENTING OPINION.

DAUSMAN, J.—I am compelled to dissent from the answer by the majority of the members of this court to the question certified herein, but I shall refrain from giving my reasons therefor. There is another

phase of the matter which to my mind is of vastly greater importance. I am of the opinion that this court ought not to answer the question at all for the reasons following:

In recent years mankind has made marvelous advancement in that realm of knowledge commonly known as the physical sciences. Especially in chemistry and physics we have moved forward by leaps and bounds. Mechanical ingenuity has been turned loose in a vast field of unlimited possibilities, and an ever-increasing number of inventions has come with a regularity akin to an arithmetical progression. The time in which we live is distinctively an age of machinery. As a natural and inevitable result industrial life has been revolutionized. Mechanics have been taken from their little isolated shops where each man worked alone at his bench with simple hand tools, and have been congregated by the hundreds and by the thousands in vast establishments where they work at power-driven machines. Powerful machinery is inherently dangerous. The production of electricity and chemicals and their extended use in industrial affairs is a prolific source of danger. The congregating of working people is in itself an element of danger. The factory, the mine, the railroad, and all places where men assemble to work, are scenes of inevitable accidents. Motor-driven vehicles have made unsafe even our streets and country roads. These things, and the rapidity of changing conditions which is a necessary concomitant, make every industrial venture hazardous for both capital and labor. The proprietors risk their capital and the workmen risk life and limb. Service in industrial life has become quite as hazardous as service in war. The workman is the soldier of organized industry.

*Stertz* v. *Industrial Ins. Com.* (1916), 91 Wash. 588, 158 Pac. 256. ''A machine as well as a bullet may produce a wound, and the disabling effect may be the same.'' *Mountain Timber Co.* v. *Washington* (1917), 243 U. S. 219, 37 Sup. Ct. 260, 61 L. Ed. 685, Ann. Cas. 1917D 642.

These considerations have made thoughtful men to stop and wonder if in the end machinery will prove to be a blessing or a curse, and whether our vaunted industrialism will not some day fall of its own weight. Eventually the conviction became general that if a deplorable end is to be avoided the methods of caring for the unfortunate victims of industrial accidents must keep pace with the march of industry itself. The conviction has become general that the men who are brave enough to risk the dangers of modern industrialism in order to earn a livelihood for themselves and their dependents must have protection in keeping with the hazards they face. Some years ago it became apparent that the common-law remedy by an action in tort is pitifully inadequate as a means of adjusting the multifarious claims for compensation growing out of personal injuries occasioned by industrial accidents. That plan came to be regarded as wasteful, unfair, demoralizing and unsatisfactory, by both employer and employe. *New York Central R. Co.* v. *White* (1916), 243 U. S. 188, 37 Sup. Ct. 247, 61 L. Ed. 667, L. R. A. 1917D 1, Ann. Cas. 1917D 629. Various statutory modifications of the common law, and substitutes therefor, have been tried, and they too have proved inadequate. It is a matter of common knowledge that employers, of their own initiative, sought refuge by procuring insurance against their liability for damages arising out of personal injury cases. Manifestly this plan could not

benefit the employe. Its only effect was to shift the uncertainty from the employer to the insurance carrier, leaving the employe to struggle against the latter°in the same old way. The situation became intolerable for all concerned, *including the public.* Finally employers and employes joined hands in an effort to get relief by legislation. See §1, Oregon Workmen's Compensation Act.

In recognition of the imperative demand for relief the legislative bodies of nearly all civilized states have enacted workmen's compensation laws. The underlying principle of all these laws is the same. The plan is a legislative venture, pure and simple. It differs radically from anything known to the common law. It eliminates the idea of *fault* on the part of both employer and employe, excepting only where it amounts to wilful misconduct on the part of the employe. *New York Central R. Co.* v. *White, supra.* It has been said that this plan provides compensation in the nature of a pension. But the better view is that it is a species of workmen's insurance—the statute itself constituting the policy. Its enactment was prompted largely by the desire to promote the public welfare by preventing disabled workmen and their dependents from becoming the victims of poverty and charges upon public charity; and the authority for its enactment is referable to the police power of the state. A consideration of the causes which lead to the conception and realization of the plan leads to the conclusion that its purpose is to provide compensation for every industrial injury by accident, excepting only where the injury is due to the workman's wilful misconduct. *Cleland* v. *Smith Bros.* (Wis.), 7 N. C. C. A. 424. The plan is remarkable for its simplicity and was adopted in

the hope that the administration of it would not be hampered by legalistic theory. Indeed one of the main objects of the plan is to get away from the complexities and perplexities of litigation; and with this object in view the legislature of Indiana wisely committed the execution of our workmen's compensation act to an administrative board which belongs to the executive department of the state government.

It is the duty of the courts to interpret the act when properly called upon to do so. In numerous instances the courts have been asked to construe the words "arising out of and in the course of the employment," as used in the following context: "Sec. 2. From and after the taking effect of this act, every employer and every employe, except as herein stated, shall be presumed to have accepted the provisions of this act respectively to pay and accept compensation for personal injury or death by accident arising out of and in the course of the employment, and shall be bound thereby." Acts 1915 p. 392. And the courts have repeatedly said that these words should be liberally construed in order to give effect to the humane and public purposes of the act; that they are broad enough to include every accidental injury which might reasonably have been contemplated by the parties at the time of entering into the contract of service; that they include every accidental injury which bears a causal relation to the service, and every accidental injury which is incidental to the service. What more can be said with any degree of safety? Every attempt to formulate a definition of said words in rigid and unyielding language which would include every injury for which compensation ought to be allowed and exclude every

injury for which compensation ought to be dis-, allowed, is fraught with the imminent danger of either narrowing or broadening the legislative intent.

Whether a particular injury "arises out of and in the course of the employment" is a question of fact. Call it an inference, or a conclusion, or an ultimate fact, or a conclusion of fact—call it what you will— it is in the realm of facts and not in the realm of law. It is just because it is a matter of fact that we find such seeming incongruity in the decisions. In this respect the reported cases appear to be a jungle of contradictions. We can no more follow them than one can follow all the roads. In every contest it is an easy matter to arrange a long list of cases on either side of the controversy. The wonderful complexity of modern industrialism, the great army of workers, the diversified conditions under which they work, and the capricious nature of accidents, must inevitably cause accidental personal injuries under an infinite variety of circumstances. It is not likely often to happen that any two contested cases will be exactly alike in all the details. Hence, as Lord Loreburn said: "We have to decide each case on the facts. Argument by analogy is valueless. * * * It is another of the very numerous cases in which the question is whether the accident arose out of and in the course of the workman's employment—words, it is admitted, of inexhaustible variety of application according to the nature of the employment and the character of the facts proved. The facts in each case are materially different, and if we are on each argument to discuss and differentiate them one from another, judgments in Courts of Law would be interminable, and would lead rather to confusion than to enlightenment." *Kitchenham* v. *S. S.*

*"Johannesburg"* (1911), 4 B. W. C. C. 311. In another case the same jurist said: "Cases are really valuable in so far as they contain principles of law. They are also of use, of course, to show the way in which judges regard facts. But in that sense they are only useful as illustrations. Judges are not laying down the law when they are explaining their reasons for coming to a conclusion of fact, and it seems to me you have to decide each case upon its own facts." In the same case Lord Ashbourne said: "I think it is impossible to measure the facts of one case by the facts of other cases. It is sufficient for us in each case that arises to apply our minds to the facts before us and to the case before us, * * * ." And Lord Shaw, assenting, said: "My Lords, may I respectfully tender my assent to the proposition which your Lordships have laid down that it is in all cases of precedents, or alleged precedents, most dangerous to treat analogies of fact as conclusive. Few cases arise in ordinary life, and few cases arise in the Law Courts, in which such analogies are complete; and unless they be complete they fail, and the attempt to evoke a principle out of them also fails." *S. S. "Swansea Vale"* v. *Rice* (1911), 4 B. W. C. C. 298.

Some person or group of persons must determine whether a particular injury arose out of and in the course of the employment. The legislature of Indiana has imposed this duty upon the Industrial Board. It is the province of the Industrial Board to hear the evidence, draw the inferences (or conclusions) therefrom, and make a finding of the ultimate facts. The parties are entitled to have their controversy decided for them in the first instance by the Industrial Board. It is their right to have the

experience, skill, discernment and judgment of the Industrial Board and, if desired, of each member thereof, brought to bear upon their dispute. This duty of the Industrial Board cannot be shifted or evaded.

After the Industrial Board has discharged its duty, then, under the legislative permission, either party may appeal to this court. On appeal this court is authorized to determine whether the evidence sustains the finding; but our attitude toward the matter is quite different from that of original triers of the facts. In accordance with the long-established rule of appellate procedure we recognize that it is the exclusive province of the Industrial Board to weigh conflicting evidence, if there be conflicting evidence; and that in all cases it is the duty of the board, in the first instance, to draw the inferences (or conclusions) from the evidence, whether conflicting or not. We carefully refrain from invading that province of the Industrial Board and confine our inquiry to the simple question: Is there any evidence tending fairly to sustain the finding? Any other rule would be likely to work gross injustice. For this court to determine as an original matter, whether an accidental injury arose out of and in the course of the employment would constitute a flagrant invasion of the province of the Industrial Board, and would amount to an usurpation of its functions and duties.

Under a fair interpretation of §61 of the act, as amended, I am of the opinion that the submission of the above question is unauthorized. It is my conviction that the answer to said question cannot operate as "a decision and determination" of the controversy and is not binding on the Industrial Board.

I have not overlooked the fact that the question is

not put in the full language of the statute. If the mere form of the question carries with it a peculiar significance—if it means that the Industrial Board is satisfied that the injury arose in the course of the employment, but is in doubt as to whether it arose out of the employment—then it may be regarded as a request for an interpretation of said §2 with special reference to this particular trouble. On that view of the matter we are bound to respond to the request by construing the troublesome words "arising out of and in the course of the employment."

The English Workmen's Compensation Act was enacted by Parliament on December 21, 1906, and the compensation laws of the United States and of the various states of the Union follow the general outlines of the English law. Naturally the courts of this country have been influenced more or less by the constructions put upon the law by the English courts. Now, it so happened that in June, 1908, Buckley L. J., sitting as a member of the Court of Appeal, took occasion to expound the words "accident arising out of and in the course of the employment." It seems to me that his explanation tends only to cloud that which is clear, to make mysterious that which is plain, and to make complex that which is simple. Here is his exposition: "The words 'out of and in the course of the employment' are used conjunctively, not disjunctively; and upon ordinary principles of construction are not to be read as meaning 'out of,' that is to say, 'in the course of.' The former words must mean something, different from the latter words. The workman must satisfy both the one and the other. The words 'out of,' point, I think, to the origin or cause of the accident; the words 'in the

course of' to the time, place, and circumstances under which the accident takes place. The former words are descriptive of the character or quality of the accident. The latter words relate to the circumstances under which an accident of that character or quality takes place. The character or quality of the accident as conveyed by the words 'out of' involves, I think, the idea that the accident is in some sense due to the employment. It must be an accident resulting from a risk reasonably incident to the employment.'' *Fitzgerald* v. *Clarke & Son* (1908), 1 B. W. C. C. 197.

But what are the qualities of an accident? Is not the origin of a thing included in the time, place and circumstances of its appearance? Is it possible that an accident may arise out of the employment and not in the course of the employment? Is it possible that an accident may arise in the course of the employment and not arise out of the employment? What does he mean by the *cause* of the accident? Is it the duty of those intrusted with the administration of the compensation laws to make an exhaustive investigation in every case of accidental injury for the purpose of determining the origin or cause of the accident? Must the workman be denied compensation in every case where the *origin and cause of the accident* are found to be in a realm outside his employment? One of the inherent weaknesses of his explanation lies in the fact that it is not the *accident,* but the *injury,* that must arise out of and in the course of the employment. The words should be read, ''accidental personal injury arising out of and in the course of the employment''; or ''personal injury (by accident) arising out of and in the course

of the employment.'' *Madden's Case* (1916), 222 Mass. 487, 111 N. E. 379, L. R. A. 1916D 1000.

Do the words ''out of and in the course of'' necessitate two distinct inquiries? The words ''out of'' do not appear in the federal act, nor do they appear in the acts of the following states: Maine, Pennsylvania, Texas. The legislative bodies of these political units, as well as of certain foreign countries other than England, have seen fit to use only the words ''in the course of.'' The words of the Louisiana act are, ''out of and incidental to.'' The words in the title to the English act are, ''Compensation to workmen for injuries suffered in the course of their employment.'' In the title to the Iowa act we find only the words ''in line of duty.'' In the title to the Indiana act the words are, ''To establish rates of compensation for personal injuries or death sustained by employes in the course of employment.'' The words ''out of'' do not appear in the titles of the acts of several of the states. While the language used in the titles of the various acts is not controlling, yet it is worthy of note as an indication of the legislative intent. Now, it is generally conceded that these acts have a common intent. In enacting them the various legislative bodies were all aiming at the same mark. With respect to the point now under consideration, none of them is either weaker or stronger than the others. The varying expressions above referred to are only different ways of saying that compensation shall be allowable for every accidental personal injury or death due to the employment.

The Indiana Compensation Law, *supra,* was enacted in the year 1915; and there is a general rule of statutory construction to the effect that where a statute is modeled after an act of a foreign country

it will be presumed to have been enacted with refer-
ence to the construction put upon it by the courts of
the country from which it is taken.   This rule is
more or less binding, according to circumstances.  It
does, however, require that this court should heed
the interpretation of the act by the English courts
prior to its enactment here.  But from a full and
complete recognition of the rule it does not follow
that we are under any obligation to approve the par-
ticular process of reasoning by which a judge arrived
at his conclusion.  I indorse the conclusion reached
by Buckley, L. J., in his assenting remarks *supra,* viz.,
that the injury for which compensation is allowable
must be due to the employment—must result from a
risk incidental to the employment.  But the particu-
lar bit of reasoning in which he indulged, while it
has not been approved generally by the courts, unfor-
tunately has misled some of them and has burdened
the administrative board charged with the execution
of the compensation laws.  It should be rejected
once for all.

NOTE.—Reported in 118 N. E. 551.  Workmen's compensation:
injuries arising out of and in the course of employment within
meaning of act, L. R. A. 1916A 40, 232, L. R. A. 1917D 114, Ann. Cas.
1913C 4, 1916B 1293, 1918B 768.