**ANCHORAGE ROOFING CO., INC., and Employer's Mutual Casualty Companies, Appellants,**

v.

**Joe GONZALES and Alaska Workmen's Compensation Board, Appellees.**

No. 1533.

Supreme Court of Alaska.

March 5, 1973.

**502**

John M. Conway and Bruce E. Gagnon, of Atkinson, Conway, Young, Bell & Gagnon, Anchorage, for appellants.

Thomas E. Curran, Jr., of Curran & Donohue, Anchorage, for appellees.

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

## OPINION

ERWIN, Justice.

In this workmen's compensation case, appellants, Anchorage Roofing Company, Inc., and its insurance carrier, Employer's Mutual Casualty Company, seek reversal of a judgment of the superior court affirming a finding of compensability by the Alaska Workmen's Compensation Board.[1] Appellants contend that the injuries suffered in an airplane crash by appellee Joe Gonzales were not injuries "arising out of and in the course of employment"[2] because the flight was primarily for a non-business purpose and because, in any event, the accident occurred during a personal-purpose "side-trip".

On Saturday, August 7, 1965, Joe Gonzales sustained multiple injuries when a Cessna Wren 460 that he was piloting from Anchorage to Homer crashed on the northeast side of Lake Tustumena. Also injured were three passengers, Wilford Martin (an Anchorage Roofing foreman), Monte Burks (an Anchorage Roofing employee), and Mike Sullivan, then 12 years old (Joe Gonzales' stepson). The aircraft was owned by Anchorage Roofing Company, Inc., a corporation of which, at the time of the accident, Mr. Gonzales and his wife were the sole shareholders.

Mr. Gonzales was traveling to Homer in order to give a job estimate on and make temporary repairs to the leaky roof of a Homer church. He intended to return to Anchorage alone after finishing the initial work. Monte Burks and Mike Sullivan planned to spend the weekend in Homer fishing. Wilford Martin was apparently going to assist Mr. Gonzales at the church and then join Mike Sullivan and Monte Burks.

In filing a flight plan from Anchorage to Homer, Mr. Gonzales allotted an additional thirty minutes of flight time for surveying the terrain around Lake Tustumena

---

1. Both the hearing before the Board and its decision were expressly limited to the issue of compensability. The Board did not receive any medical testimony and did not render a specific compensation order: it ruled simply that Mr. Gonzales was entitled to compensation of any unknown amount. Review in the superior court may therefore have been premature under AS 23.30.125(e) which provides the exclusive means of "suspending, setting aside, or enforcing a compensation order." *Cf.* Aleutian Homes v. Fischer, 418 P.2d 769, 773 (Alaska 1966). However, appellees have not contested the jurisdiction of either the superior court or this court. We have relaxed our rules to expedite disposition of this case in view of the failure of either party to raise this issue in the superior court and the peculiar nature of this case.

2. AS 23.30.265(13).

and for locating a small dirt airstrip in anticipation of a future hunting trip. In accordance with this scheme, Mr. Gonzales, upon reaching the Lake Tustumena area, departed from the direct flight path to Homer, which is over the center of Lake Tustumena, and veered to the east approximately three miles in search of the dirt airstrip. Airspeed was reduced from a cruising velocity to approximately 50 or 60 m. p. h.; the aircraft was also dropped from a normal cruising altitude of approximately 3500 feet above ground to a scanning altitude of 400 to 500 feet above ground. At some point during this low-level, slow-velocity flying, the nose of the aircraft dropped and the plane crashed. The cause of the accident is unknown.[3] On appeal to this court appellants contend that the Workmen's Compensation Board erred in holding, and that the superior court erred in affirming the decision, that Mr. Gonzales' injuries arose out of and in the course of his employment. Appellants present two arguments: first, substantial evidence is lacking to support the Board's conclusion that the business purpose of the Homer trip was sufficiently central to its occurrence to allow compensation under the Act—a dual purpose issue; and second, the Board erred as a matter of law in not finding that the business character of the trip lapsed during the scanning operations—a deviation issue. As to the latter issue, the appellants argue that the Board erred in finding that the flight deviation was insubstantial and in ruling that the company practice allowing such deviations was supportive of compensation. In addition appellants contend that the superior court erred in holding that the lack of increased risk introduced by the deviation supported compensability, in holding that no substantial evidence existed to support a conclusion of added risk, and in holding that appellants had the burden of producing substantial evidence of increased risk.[4]

■ This court's review of factual findings made by the Board is limited to a determination of whether the Board's findings are supported by substantial evidence in light of the record as a whole.[5] Substantial evidence is "such relavant [sic] evidence as a reasonable mind might accept as adequate to support a conclusion." [6]

It might be noted here that appellants attempt to clothe much of their argument in the garb of doctrinal law, thus turning issues involving the legal sufficiency of the evidence into questions regarding whether the Board and the superior court applied the correct law to the evidence. As to the latter, this court is presumably not so limited in its review power.[7] Whether an issue is posed as one of substantial evidence or of "pure" law largely depends upon whether one emphasizes the decisional discretion vested in the Board or the power of this court to limit that discretion by judicially developed parameters of compensability.

Another problem of approach is posed by the presumption of compensability found in AS 23.30.120 [8] and the holding in R.C.A. Service Co. v. Liggett, that "[t]he burden

3. Appellant testified that he thought the plane had entered a downdraft; Mike Sullivan testified by deposition, that he thought the plane's engine stopped.

4. Appellants do not contend that the injuries suffered by Mr. Gonzales are noncompensable by reason of the "going and coming". rule. Cf. State Dep't of Highways v. Johns, 422 P.2d 855 (Alaska 1967); Northern Corp. v. Saari, 409 P.2d 845 (Alaska 1966); R.C.A. Serv. Co. v. Liggett, 394 P.2d 675 (Alaska 1964).

5. Wilson v. Erickson, 477 P.2d 998, 999 (Alaska 1970), and cases cited therein;

Beauchamp v. Employers Liab. Assurance Corp., 477 P.2d 993, 994 (Alaska 1970), and cases cited therein.

6. Thornton v. Alaska Workmen's Compensation Bd., 411 P.2d 209, 211 (Alaska 1966) (footnote omitted).

7. Cf. Wilson v. Erickson, 477 P.2d 998, 999 (Alaska 1970).

8. AS 23.30.120 provides that in workmen's compensation proceedings "it is presumed, in the absence of substantial evidence to the contrary, that (1) the claim comes within the provisions of [the Alaska Workmen's Compensation Act] . . . ."

of proving that an injury arose out of and in the course of the employment rests upon the claimant for compensation . . . ."[9]

■■■ There is no inconsistency for the presumption of AS 23.30.120 places a burden on the employer to go forward with evidence on the issue of whether the injury arises outside or within the scope of employment. Once competent evidence is introduced, the presumption drops out, and the final burden of proof as alluded to in R.C.A. Service Co. v. Liggett as to all essential elements is on the claimant.[10] If an affirmative defense to the claim is asserted by the employer, then he has the burden of proof as to such defense.

### 1. *The Dual Purpose Issue*

As far as Mr. Gonzales was concerned, his trip from Anchorage to Homer can fairly be characterized as one for both business and personal purposes. He intended to estimate and work on a roofing job in Homer, on the other hand, he was taking his stepson and two employees to Homer for a fishing trip, and he also desired to explore certain terrain en route in anticipation of a future hunting trip.

The formula generally used[11] to determine whether, on a dual purpose trip, the business purpose is sufficient to allow recovery under a Workmen's Compensation Act was first stated by Mr. Justice Cardozo in the landmark case of Marks' Dependants v. Gray, 251 N.Y. 90, 167 N.E. 181 (N.Y.1929), as follows:

We do not say that service to the employer must be the sole cause of the journey, but at least it must be a concurrent cause. To establish liability, the inference must be permissible that the trip would have been made though the private errand had been canceled. . . . The test in brief is this: If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own. . . . If, however, the work has had no part in creating the necessity for travel, *if the journey would have gone forward though the business errand had been dropped, and would have been canceled upon failure of the private purpose, though the business errand was undone, the travel is then personal, and personal the risk.* (at 183) (Emphasis added, footnote omitted.)

The Board found that the flight "would have been taken even if it had not been used for the purpose of searching for a landing strip or to take passengers to Homer to go fishing." Because there was substantial evidence to support this conclusion, no error was committed as to this aspect of the appeal. Mr. Gonzales testified that he had planned to return to Anchorage immediately after finishing the preliminary work on the Homer job, that the fishing trip for his passengers was arranged only after deciding to fly to the Homer job, and that, because of other current jobs in Anchorage, he would not have gone to Homer if he had not had the work there.[12]

---

9. 394 P.2d 675, 677 (Alaska 1964) (footnote omitted).

10. *See* Vozzolo v. Britton, 377 F.2d 144 (D.C.Cir. 1967) ; Butler v. District Parking, 363 F.2d 682 (D.C.Cir. 1966) ; Nardi v. Willard, 156 F.Supp. 425 (D.C.N.Y. 1957).

11. 1 A. Larson, the Law of Workmen's Compensation § 18.12, at 294.4–294.10 (1972). *See also* Uganik Fisheries, Inc. v. Alaska Indus. Bd., 12 Alaska 242, 246–247 (D. Alaska 1949).

12. Appellants note that several of Mr. Gonzales' passengers were going to Homer solely to fish, that the aircraft had previously been used for personal trips, that more than one-third of total planned flight time had been allotted to scanning operations, and that Mr. Gonzales may have agreed to return to Homer to pick up his passengers if they were unable to catch a commercial flight. Appellants then argue that "[i]n view of these facts, it is reasonable to conclude that the entire trip, including the detour to Lake Tustemena, would not have taken place except for the

■ Thus, appellee has presented substantial evidence which established that the injury arose out of and in the course of employment. The presumption of AS 23.-30.120 would apply until such time as there was evidence that appellee was outside the scope of his employment. At such time the claimant would then have the burden of going forward with evidence of the job related nature of the injury. We find the claimant met such a burden herein.

## 2. The Deviation Issue

More troublesome is appellants' other contention that, assuming the dual purpose formula permitted characterizing the overall trip as one for a business purpose, the identifiable deviation in scanning the area around Lake Tustumena for purely personal reasons removed Mr. Gonzales from the course of his employment during the period of deviation.

Deviation cases are legion. Both parties cite a number of such cases in support of their respective positions. These are of only limited help, however, both because of the infinite variety of factual patterns, which vary in the degree of deviation from a minor detour to a complete temporary abandonment of an employer's business, and because the results often appear to have been dictated by judicial attitudes toward workmen's compensation acts.

In measuring the legal effect of a departure from a normal business route, the guideposts are the materiality of the deviation and its purpose. Professor Larson states the following general rule:

> An identifiable deviation from a business trip for personal reasons takes the employee out of the course of his employment until he returns to the route of the business trip, unless the deviation is so small as to be disregarded as insubstantial.

1 A. Larson, The Law of Workmen's Compensation, § 19.00 at 294.57 (1972). Appellants ask for a holding by this court that, as a matter of law based on the evidence before the Board, Mr. Gonzales had temporarily abandoned his employment to pursue a purely personal endeavor and that the deviation was substantial.

Some older cases from other jurisdictions denied compensation unless the employee was, at the time of injury or death, performing his normal work to the direct benefit of his employer.[13] However, today it is generally held, utilizing the rubric of various doctrines,[14] that an employee is entitled to compensation so long as the activity is reasonably foreseeable and incidental to his employment.[15]

Either of two doctrines provide a legal base to uphold the finding of compensability below. First, under the "authorization" doctrine, the Board found that Mr. Gonzales "considered the deviation from the direct route a privilege of employment . . . in accordance with company

personal interest and pleasure to be derived by Claimant and his passengers and that any work which the Claimant may have done in Homer was merely incidental thereto." That other substantial evidence (not presented) might have led to a different conclusion is not the issue before this court.

13. E. g., In re Betts, 118 N.E. 551 (Ind. 1918); In re O'Toole, 118 N.E. 303 (Mass.1918); Spooner v. Detroit Saturday Night Co., 153 N.W. 657 (Mich.1915).

14. E. g., the "personal comfort", "emergency", "authorization", or "minor deviation" doctrines.

15. In Northern Corp. v. Saari, 409 P.2d 845, 846 (Alaska 1966), this court held: [I]f the accidental injury or death is connected with any of the incidents of one's employment, then the injury or death would both arise out of and be in the course of such employment.
See also State Dep't of Highways v. Johns, 422 P.2d 855, 859 (Alaska 1967).

practice . . . ."[16] There are many cases holding that an otherwise personal deviation is compensable where authorized, expressly or by implication, and of some incidental benefit to the employer, at least where the deviation does not introduce substantial additional hazards.[17]

We prefer, however, not to rest our decision on such a base in view of the peculiar nature of the business herein and the near identity of claimant and company. For all practical purposes, it would be impossible to disprove such a claim in any small family owned corporation. We prefer to await a proper factual presentation to the Board before deciding such a question.

The second doctrine which could be applied is characterized as the "minor deviation rule".

Appellants quote from Larson's discussion of the minor (or insubstantial) deviation rule[18] in arguing that the Board's characterization of the scanning operations as "insubstantial" is both contrary to law and unsupported by substantial evidence. As to the first contention, appellants quote from 1 A. Larson, The Law of Workmen's Compensation § 19.63 at 294.99 (1972), in arguing that the characterization of a deviation as insubstantial should be limited to the kind of "minor interludes which now most courts would treat as immaterial under the personal comfort doctrine."[19] While Professor Larson does analogize certain "insubstantiality" cases to "personal comfort" cases in the cited section, he does not intimate that the two categories are identical. Indeed, in the two preceding sections he discusses two additional considerations which courts have also utilized in assessing the significance of a deviation: added risk (§ 19.61) and nature of employment[20] (§ 19.62).

Appellants also assert that the Board's conclusion (that the deviation was insubstantial) is unsupported by substantial evidence. Although the accident occurred only three miles off the normal route, appellants argue that the materiality of the deviation is established by the facts that

16. The Board's first conclusion of law reads in part:
> The defendant claims that the applicant deviated from the direct air route between Anchorage and Homer for strictly personal reasons. The Board finds that it is more reasonable to believe that the applicant, as manager for the employer, considered the deviation from the direct route a privilege of the employment to be exercised by him, acceptable and in accordance with company practice for relationship for both himself and the two employees, Martin and Burks.

17. *E. g.*, Strauss v. Industrial Comm'n., 73 Ariz. 285, 240 P.2d 550, 553–554 (1952) (sidetrip to grocery store); Tinsman Mfg. Co. v. Sparks, 211 Ark. 554, 201 S.W.2d 573 (1947) (sidetrip to buy tobacco); Green v. Bell Cleaners, 34 N.J. 467, 167 A.2d 815 (N.J.App.Ct.1961) (four to five mile detour to take co-employee home).

18. 1 A. Larson, The Law of Workmen's Compensation § 19.63 at 294.99 (1972).

19. The "personal comfort" definition encompasses those momentary diversions from an employment which for social and biological reasons, are inextricably bound up with the normal work flow of an individual, such as eating, drinking, resting, washing, smoking, conversing, seeking fresh air, coolness or warmth, going to the toilet, etc. See 1 A. Larson, The Law of Workmen's Compensation § 19.63 (1972).

20. The "nature of employment" consists of those qualities or attributes of a particular employment that define and delimit its parameters, distinguishing it from some other employment. For example, time (long or short hours, overtime, etc.), space (definite office, no office, moveable office, etc.), movement (definite travel routes—e. g. deliverymen—random routes —e. g. salesmen—no major movement, etc.), employer-employee relationships (formal, relaxed, mutual expectations, business customs, etc.), public expectations and conceptions of the employment (house calls, deliveries, traditional social roles, etc.). See 1 A. Larson, The Law of Workmen's Compensation § 19.62 (1972).

one-third of the one-way flying time was allotted to the detour and that a substantial number of miles were therefore to be covered in the low-speed, low-altitude scanning operations.

■ An encompassing "substantiality" test has not emerged from either the case law or from Professor Larson. Rather, there is the need, in close cases, to balance a variety of factors such as the geographic and durational magnitude of the deviation in relation to the overall trip, past authorization or toleration of similar deviations, the general latitude afforded the employee in carrying out his job, and any risks created by the deviation which are causally related to the accident.[21]

The first three factors noted above would appear to weigh in favor of compensability. As to the "added risk" factor, the superior court, in affirming the Board's finding of compensability, emphasized that no substantial evidence has been introduced at the hearing to support a conclusion that the deviation introduced any added risks to the flight. Appellants cite the following statement from Larson (§ 19.61 at 294.94):

> If the incidents of the deviation itself are operative in producing the accident,

this in itself will weigh heavily on the side of non-compensability . . . ..

and argue that the presence of a causal relationship between risks incident to the deviation and the accident is a factor which weighs against compensability but that the absence of added risk cannot be weighed in favor of compensability. "It is strictly a negative, and not a positive, factor to be considered." This argument is logically inconsistent and the case decisions make no such distinction.[22]

Appellants also argue that evidence presented to the Board conclusively established "added risks". However, the only support given for this proposition is the bald conclusion that

> [t]he likelihood of injuries resulting from either [engine failure or a downdraft] was substantially increased when [Mr. Gonzales] deviated from the cruising altitude to a scanning altitude of 400 to 500 feet, and when the airspeed was reduced to 50 or 60 mph from 145 mph . . . .. The Claimant was simply not in a position to regain control of the aircraft.

No evidence before the Board supports this conclusion.[23]

---

21. *See generally* 1 A. Larson, The Law of Workmen's Compensation §§ 19.61 to 19.63 at 294.94–294.103 (1972).

22. *E. g.*, Strauss v. Industrial Comm'n., 73 Ariz. 285, 240 P.2d 550, 553–554 (1952) ; Chrisman v. Farmers Cooperative Ass'n. of Bradshaw, 179 Neb. 891, 140 N.W.2d 809, 812 (1966) ; Green v. Bell Cleaners, 34 N.J. 467, 167 A.2d 815 (N.J.App.Ct. 1961).

23. Appellants assert in their brief that Mr. Gonzales "in effect" testified that the changed flight pattern substantially increased the risk of an accident; however, the cited transcript page does not support that assertion. Appellants in their statement of facts characterize the reduced airspeed as "very close to stall speed"; however, the testimony of Mr. Gonzales,

Mr. Martin, and Mike Sullivan, all cited by appellants in support of that characterization, indicates that the speed of the plane just prior to the accident was nearly twice that at which Mr. Gonzales testified the plane would stall.

Mr. Gonzales testified in part as follows concerning the accident:

> Q. Tell us what you did now . . . did you actually turn off the course to look for this dirt strip . . . or . . . tell us what happened as best you can remember it of the accident.

> A. Well I didn't make a complete 90 degree turn I angled off into that direction arriving at Tustemena [sic] Lake.

> Q. Now by angling off does that mean that you . . . as you approached Tustemena [sic] Lake you drifted slightly to the left.

Appellants finally argue that the superior court, by emphasizing the lack of substantial evidence to support a conclusion of added risk, in effect improperly placed upon them the burden of producing evidence on this issue. We find the superior court acted properly. If appellants wished to rely on the defense of increased risk because of the changed method of flight, they had the burden of going forward with appropriate evidence indicating such an increase in risk. By failing to do so, they simply did not establish the defense claimed.

While this case appears to be a close one, there is substantial evidence to support the findings of the Board. The decision of the superior court is affirmed, this case is remanded to the superior court with instructions to remand it to the Alaska Workmen's Compensation Board for further proceedings on the question of compensation.

A. Right. Instead of making a 90 degree turn at Tustemena and flying over the water.

Q. Alright and uh how far were you into this drifting off to the left when the accident occurred. Had you found the strip . . .

A. No never did. I didn't, well we made one circle and as we made a turn we seemed to hit a downdraft . . . I never did get the full report of what happened, whether we had carburetor ice or faulty engine or that's something I never did find out, but I found out later from the FAA there was turbulence in the area that caused a downdraft.

Mr. Martin, an experienced student pilot, testified in part as follows concerning the accident:

Q. Do you recall prior to the accident approximately any of the characteristics of the aircraft . . . was Mr. Gonzales flying fairly slow at that time.

A. He was making 55 to 60 miles an hour which 60 or 65 is about the top that you can do when the flaps are down and it's in (unclear) configuration.

\*   \*   \*   \*   \*

Q. Prior to the time that you saw that strip was . . . was Mr. Gonzales slow flying the aircraft at that time.

A. Uh . . . slow flying would be the wrong word for it because slow flying is a term used for flying a conventional plane in slow flight, you have your nose up and you're kind of hanging on the prop and this plane is completely different and the term doesn't apply to it.

Q. I see. How would you describe it.

A. You're going slow, but it's normal flight for this particular plane when your flaps are down.

Mike Sullivan testified by deposition as follows concerning the accident:

No, we just saw a moose, and this Monte Burke, he he thought he saw a little runway where a piper had landed probably, and so we turned around from the moose and we had gone donw [sic] and we slowed down full flaps and we were going about 50 miles an hour and finally, the engine quit and he was holding the nose up and then the nose dropped and it crashed.