W. Austin **CHEEKS**, Appellant,

v.

**WISMER & BECKER/G.S. ATKINSON, J.V. and Alaska Workers' Compensation Board**, Appellees.

No. S–1579.

Supreme Court of Alaska.

Sept. 11, 1987.

---

Joseph A. Kalamarides, Kalamarides and MacMillan, Anchorage, for appellant.

Michael C. Geraghty, Schaible, Staley, DeLisio & Cook, Inc., Anchorage, for Wismer & Becker/G.S. Atkinson, J.V., appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

This appeal arises from the denial by the Alaska Workers' Compensation Board ["the Board"] of Austin Cheeks' claim for compensation for a neck injury he allegedly sustained as a result of a fall which occurred while he was working as a pipefitter for Wismer & Becker/G.S. Atkinson, J.V. ["Wismer & Becker"]. The superior court affirmed the Board's decision.

The precise question presented is whether the Board erred in denying the claim on the ground that Cheeks failed to present sufficient evidence to establish the "preliminary link" necessary to give rise to the presumption of compensability.

## I. FACTS.

On October 8, 1983, while attempting to loosen a frozen pipe in the course of his work as a pipefitter for Wismer & Becker, Austin Cheeks allegedly slipped and fell from the catwalk platform handrail on which he was standing to the platform floor. According to Cheeks, at the time of his fall, he had one foot positioned on the top rail and the other on the center rail; he was jerking downward on the pipe, which was above shoulder height; and when the pipe slipped, he fell about three feet, backward, and landed on his back or buttocks against a steel grating. Ray Nickel, Cheeks' work partner at the time, did not recall Cheeks falling on his back or falling against anything after the wrench slipped but acknowledged that Cheeks may have hurt his back and that he himself had only a vague recollection of the details of the incident.

Cheeks felt severe back pain immediately but continued to work for a couple of hours. When the pain did not subside, Cheeks had the shop steward complete an accident report and went to the company medic for treatment. The report completed by the steward described the "nature of injury" as "unknown/but seems to be lower back area." The medic's diagnosis was acute low back sprain with spasm, and he prescribed bed rest and Valium.

Cheeks returned to work the next day, although his work partner Nickel took over the heavy work and Cheeks evidently complained of increased back pain.[1] Cheeks

1. Nickel did not recall any complaints from Cheeks concerning his neck. Norman Pawlik, Cheeks' work roommate, testified that Cheeks said that "he strained himself, his back or his neck or something" on one occasion but had never again mentioned any pain, discomfort, or

testified that he thought the pain would gradually recede and that he was afraid of finding out that he had aggravated his prior back injuries. Nickel recalled that Cheeks increased his intake of painkilling medication subsequent to the alleged accident.[2]

Cheeks continued to work until he was laid off (for reasons unrelated to his injury) on October 30, approximately three weeks after the incident in issue. About a week after returning home, on November 7, he made an appointment with a new doctor for an evaluation; he testified that he was then experiencing considerable (and worsening) pain traveling from his neck and radiating down his arms, as well as extreme weakness and muscular shaking. That same day, another accident occurred. Cheeks had opened the door of his parked truck and was reaching into the cab when a car backed up into the door, pinning him between the door and the cab; the door's armrest hit Cheeks' lower back area just above the site of his 1979 surgery. The impact nearly rendered Cheeks unconscious and he suffered scalp lacerations; when he regained his sensibilities, he felt pain "[u]p, down my back, every place." He was taken by ambulance to the local medical center, where medical personnel took x-rays, stitched the lacerations, and "gave me a shot of demerol and told me to go home, and that there was ... nothing wrong that they could see."

Two days after the November 7 car incident and treatment, Cheeks sought further medical help, and a physician's assistant diagnosed "strain[ed] neck" and "strain[ed] low back [with] irritation of ... nerve routes and possible reinjury of old injuries." The medical report contains no mention of an October work injury.

On November 12, Cheeks was admitted to Humana Hospital in Anchorage with continuing low back pain and problems with his bladder, bowels, and testicles; his "biggest concern was not the neck at that point in time." His treating physician at this time, Dr. Richard Lehman, said that Cheeks gave a detailed account of his prior back problems but did not mention the alleged October work injury (contrary to Cheeks' deposition testimony that he informed Lehman about it). The admission history taken by Lehman, a neurosurgeon, indicates that Cheeks "complained of increasing back pain" and states: "It might be noted that rotation of his head and neck does give him discomfort." Lehman testified that Cheeks did complain of neck pain, but retained good range of motion and did not mention other symptoms that might be referable to cervical (neck) disc lesion or herniation. Cheeks indicated to Lehman that "he was in his usual state of condition" until the car incident. Based on the history and symptoms related by Cheeks and his own examination, Lehman diagnosed a general sprain of the cervical musculature and a flare-up of residual problems from his prior fusion attributable to the car incident.

During Cheeks' hospitalization, Dr. Robert Fu was asked to consult on Cheeks' lower back condition. Fu's consultation report described lower back and neck discomfort, concluding that Cheeks "most likely has a cervical [neck] strain as well as lumbar strain from the recent [November 7] accident." Fu testified that nothing in his physical examination suggested the existence of nerve lesion at that time. His report again sets out the medical history obtained from Cheeks, and lacks any refer-

anything else related to his physical condition. Pawlik never observed Cheeks taking medication or having any difficulty moving but also conceded that he did not have much opportunity to observe him.

2. Cheeks had a significant prior history of lower back problems which the parties do not dispute. He underwent two operations in 1977 in an attempt to relieve severe lower back pain experienced as a result of a fall in 1976; because his symptoms continued, a third operation was per-

formed in 1979 by Dr. James Coulter, the neurosurgeon who ultimately performed the neck surgery allegedly necessitated by the injury in issue here. (Coulter performed no surgery in Cheeks' neck area in 1979 but did note the presence of degenerative disc disease there at that time.) Following the 1979 surgery, Cheeks received temporary total disability compensation and lump-sum payment of permanent partial disability compensation, and he returned to work after vocational retraining.

ence to the alleged October work injury; Fu also testified in his deposition that he had no recollection of Cheeks' mentioning the October work accident, and that his notes would normally reflect such information if it were related to him. Cheeks related his problems to the car incident, and his symptoms were consistent with the type of accident he described. In comparing the results of relevant neurological tests performed on Cheeks in 1979 and January 1984, Fu stated that the tests showed no denervation indicative of cervical disc lesion or herniation, but rather showed "changes that [were] non-specific" and "non-conclusive." Fu stated that the worsening of the defect in Cheeks' cervical area could have been caused by trauma or by natural progression of the degenerative condition.

Cheeks was released from the hospital after six days, apparently without having undergone any major procedures. The report of his follow-up visit in mid-December noted no significant changes in his condition and recommended "get[ting] on with a good back support and to just conservatively treat this for now." After his discharge, however, Cheeks made an appointment to see Dr. James Coulter in Los Angeles on January 18, 1984. He was concerned because the physicians at Humana supposedly told him that the fusion performed by Coulter in 1979 had not healed, and he continued to experience neck pain radiating to his arms as well as constant lower back pain. Coulter's January 18 report does describe Cheeks' alleged work accident, stating in part that "[h]e had immediate onset of pain in his neck which extended across the shoulders and an exacerbation of lower back pain," and indicating that Cheeks had "increasingly severe pain his neck and upper extremities" prior to the November 7 car incident. (Coulter found the 1979 fusion healed.) Coulter expressed the opinion that "[a]s the result of a fall four feet down from an icy handrail 10/8/83 onto metal grating, [Cheeks] sustained a marked aggravation of preexisting, previously mildly symptomatic degenerated disc at C5–C8, with probable herniation of disc, compressing right C6 nerve root." Coulter further stated in his report that the intervening car incident "aggravated his neck condition, but it is notable he already had radiating pain and a feeling of numbness and weakness in his arms and hands." After comparing the results of various diagnostic tests performed on Cheeks in 1979 with those done in January 1984, Coulter concluded that Cheeks had a herniated disc in his neck; he recommended, and subsequently performed, neck surgery in January 1984 to resolve the herniated disc problem.

At the Board hearing, Coulter testified that he believed the October work injury was a substantial factor in causing Cheeks' herniated disc. He also confirmed his prior deposition testimony that this opinion was based only on the history of symptoms as related to him by Cheeks, not on any independent or objective facts. He stated in part: "We rely on our patients to tell us what happened to them, and in this instance I'm relying on Mr. Cheeks to have told me the truth." [3] Coulter agreed that

3. Coulter's responses to other questions posed at the Board hearing exemplified this reliance on Cheeks' description of his symptoms. Relevant excerpts from his examination follow:
Q Doctor, do you feel that you would have had to do the surgery that you did even if he hadn't had the car accident?
A That's a hard question to answer. I think within reasonable probability, yes, because I think that he was having weakness and he says he couldn't even hold a coffee cup up, which is his description of it, but he did have weakness according to his story before this auto accident, and I think the answer is within reasonable probability the operation would have been necessitated whether or not he had the auto accident.

Q Um-hum. Uh.....
A In other words, most of the symptoms of the disk were there before, from what he tell [sic] me, and that's really all I have to rely on.
....
Q ... Do you think that you would have had to perform the surgery with only the car accident?
A It's difficult to answer, but on the basis of what I know, the answer would be no, because I think that the symptoms that he had after that automobile accident were only accentuation of pre-existing signs and symptoms that he was complaining of.
....
Q [L]et me just ask you to assume for a moment Doctor that there were no symptoms

"the hook upon which this all hangs" is the fact that Cheeks reported experiencing neck-related symptoms after the October work accident (and, impliedly, before the November 7 car incident).[4] Coulter further testified that it would not be unusual for a person experiencing neck trauma not to exhibit radicular symptoms for weeks or even months after the accident, and that medication could have subdued Cheeks' neck and arm pain, allowing him to continue working even if he did sustain the alleged injury.

## II. PROCEEDINGS BELOW.

The Board denied Cheeks' "claim for disability compensation, medical benefits, costs, and attorney fees related to a fusion of the fifth and sixth cervical (neck) vertebrae." The Board concluded that Cheeks "failed to establish a *prima facie* case that his pre-existing cervical degenerative disc disease was aggravated 8 October 1984 [sic] so as to be a substantial factor in bringing about a herniated cervical disc."

In holding that Cheeks "failed to present sufficient evidence to establish a *prima facie* case, and therefore failed to raise the presumption of compensability," the Board expressed its belief that the case turned on the credibility of Cheeks and his wife. In this respect the Board found that neither Cheeks nor his wife was a credible witness and, more specifically, that "their testimony regarding the onset of cervical radicular symptoms is not believable."

In regard to Dr. Coulter's testimony, the Board noted that it "clearly relies on [Cheeks'] account of his symptoms," and stated:

While we do not *disregard* Dr. Coulter's testimony, we find it alone is not sufficient evidence to make a *prima facie* showing that [Cheeks] aggravated his pre-existing cervical degenerative disc disease on 8 October 1983 and that the aggravation was a substantial factor in bringing about a herniated disc when taken in context with his whole testimony and with our findings [related to the Cheeks' credibility] above.

Cheeks appealed the Board's decision to the superior court, contending that the Board erred in holding that he failed to establish the presumption of compensability. The superior court affirmed the Board's decision.

## III. DID THE BOARD ERR IN HOLDING THAT CHEEKS FAILED TO PRESENT SUFFICIENT EVIDENCE TO ESTABLISH THE "PRELIMINARY LINK" NECESSARY TO RAISE THE AS 23.30.120(a) PRESUMPTION OF COMPENSABILITY FOR HIS NECK INJURY?

Alaska Statute 23.30.120(a) establishes a presumption that an employee's claim for compensation comes within the ambit of the Alaska Workers' Compensation Act in the absence of substantial evidence to the contrary.[5] A claimant's dis-

referable to his neck after this work accident. The automobile accident, in and of itself that caused laceration to his scalp, almost knocked him out, that is the type of accident in and of itself which could either cause a herniated disk in a man of his condition or severely aggravate a pre-existing defect which he had in ... 1979, that's correct, isn't it?
A Yes, and had I been presented with a patient who said he—that he had.....
Q Exactly.
A .....intermittent neck pain prior to this thing, and that he had onset of pain down his arm after the accident, I would be wont to attribute it to.....
Q I understand.
A .....the specific trauma which initiated those symptoms.
Q I understand. Thank you. I'm done.

---

4. In reviewing the reports of Drs. Fu and Lehman, Coulter stated, "It's hard to conceive that he wasn't complaining of some neck pain, at least after the aggravation. It's a different story than I get." Coulter also described Cheeks as "a very anxious, uptight kind of guy ... who gives you a dramatic kind of story about his complaints ..." but also added, "although he does maybe color his complaints ... when he does complain of things, we find objective findings to corroborate [them]."

5. AS 23.30.120(a) reads in part:
 In a proceeding for the enforcement of a claim for compensation under this chapter it is presumed, in the absence of substantial evidence to the contrary, that (1) the claim comes within the provision of this chapter....

ability is presumed to be compensable when he or she demonstrates a "preliminary link" between the disability and his or her employment. *Burgess Constr. Co. v. Smallwood (Smallwood II)*, 623 P.2d 312, 316 (Alaska 1981) (construing *Commercial Union Cos. v. Smallwood (Smallwood I)*, 550 P.2d 1261, 1267 (Alaska 1976)); *see also Delaney v. Alaska Airlines*, 693 P.2d 859, 862 (Alaska 1985). The purpose of the preliminary link requirement is "to rule out cases in which [the] claimant can show neither that the injury occurred in the course of employment nor that it arose out of [employment]," but "[i]t is not yet entirely clear what initial demonstration of employment-connection will give the presumption a foothold." 1 A. Larson, *Workmen's Compensation Law* § 10.33, at 121 (1978) (footnote omitted), *quoted in Smallwood II*, 623 P.2d at 316 n. 4.

We have indicated that "a mere showing that the injury occurred at work" will often suffice to make the employment-connection, but medical evidence is often necessary when a claim is based on "highly technical medical considerations." *Smallwood II*, 623 P.2d at 316 & n. 4. This court further stated that "the claimant need *not* present substantial evidence that his or her employment was a substantial cause of ... disability" in order to establish the required preliminary link. *Fox v. Alascom, Inc.*, 718 P.2d 977, 984 (Alaska 1986) (emphasis added). What a claimant is required to produce is "some evidence that the claim arose out of, or in the course of, employment before the presumption arises." *Smallwood II*, 623 P.2d at 316. On the other hand, "the mere filing of a claim" does not give rise to the presumption of compensability. *Id.*

As we noted in *Burgess Constr. Co. v. Smallwood (Smallwood III)*, 698 P.2d 1206, 1211 (Alaska 1985) (citations omitted):

Once the presumption of compensability has been raised, it is the employer's burden to overcome the presumption by coming forward with substantial evidence that the injury was not work related. There are two methods by which the presumption can be overcome: 1) affirmative evidence that the injury was not work-related, or 2) elimination of all reasonable possibilities that the injury was work connected.

. . . .

Once it has been determined that the presumption has been successfully rebutted, the next step in the analysis is to determine whether the employee has proved all elements of his claim by a preponderance of the evidence.

In the case at bar, the Board did not address the question of whether Wismer & Becker overcame the presumption of compensability with substantial evidence that Cheeks' injury was not work related, nor did the Board consider whether, if the presumption was rebutted, Cheeks proved all the elements of his claim by a preponderance of the evidence. The sole issue addressed by and decided by the Board concerned the question of whether Cheeks had produced sufficient evidence to establish a "preliminary link" between his claimed disability and his employment.

 In our view the Board erred in its determination that Cheeks had not established a "preliminary link" between his claimed disability and his employment.[6] Our review of the record persuades us that Cheeks has produced some evidence that the claim arose out of his employment as a pipefitter for Wismer & Becker, when he slipped and fell on October 8, 1983, while attempting to loosen a frozen pipe. Cheeks' own testimony, corroborated in part by that of his partner Ray Nickels and his roommate Norman Pawlik, together with Dr. Coulter's testimony, constitutes some evidence that Cheeks' neck injury re-

---

6. "In reviewing a determination of the [Board], the applicable standard of review is ... the substantial evidence test." *Miller v. ITT Arctic Servs.*, 577 P.2d 1044, 1049 (Alaska 1978) (footnote omitted). This court may not reweigh the evidence or draw its own inferences from the evidence; if, in light of the record as a whole, there exists such relevant evidence as a reason-

able mind might accept as adequate to support a conclusion, then the Board's order must be affirmed. *Id.; see also Delaney* 693 P.2d at 863. It is the function of this court only to determine whether such evidence exists. *Kessick v. Alyeska Pipeline Serv. Co.*, 617 P.2d 755, 757 (Alaska 1980).

sulted from that slip and fall.[7] As we noted in *Fox,* it is not necessary that the claimant present substantial evidence that his employment was a substantial cause of his disability in order to establish the preliminary link necessary for the presumption of compensability. *See* 718 P.2d at 984. Here Cheeks introduced sufficient evidence that his injury occurred in the course of his employment and thus established the requisite preliminary link.

Our holding on this issue requires us to remand the matter to the superior court for remand to the Board to determine whether Wismer & Becker has overcome the presumption of compensability by coming forward with substantial evidence that the injury was not work related. In the event the Board determines that the presumption of compensability has been successfully rebutted, the Board must then determine whether Cheeks has proved all the elements of his claim by a preponderance of the evidence.

REVERSED and REMANDED for further proceedings consistent with this opinion.[8]

---

7. Further corroboration of Cheek's October 8 slip and fall is found in the medic's diagnosis and the report of injury completed by the shop steward.

8. Our detailed reference to the record at the outset of the opinion indicates that the record appears adequate for the Board on remand to carry out a complete analysis of the remaining issues. The Board may of course hold further hearings and take additional evidence if necessary.