**EXCURSION INLET PACKING CO.,
and Alaska National Insurance
Company, Appellants,**

v.

**Antonio L. UGALE (deceased), Appellee.**

**No. S–10790.**

Supreme Court of Alaska.

June 11, 2004.

Constance E. Livsey, Colleen A. Libbey, Holmes Weddle & Barcott, Anchorage, for Appellants.

Michael J. Patterson, Law Office of Michael J. Patterson, Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

PER CURIAM.

The decision of the superior court reversing the decision of the Alaska Workers' Compensation Board is AFFIRMED, for the reasons expressed in the superior court's opinion set forth in the appendix.[1]

APPENDIX

IN THE SUPERIOR COURT FOR
THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT
AT ANCHORAGE

ANTONIO L. UGALE (deceased),
Appellant,

v.

EXCURSION INLET PACKING CO. and
ALASKA NATIONAL INSURANCE
CO., Appellees.

Case No. 3AN–01–12796 CI

**Decision on Appeal**

Excursion Inlet is a narrow bay off Icy Strait, located some thirty-five miles west of Juneau[1] and twenty-five miles north of Hoonah. Antonio Ugale began working there for his third summer on June 24, 1999, but quit about three weeks later.[2] No available flights out were scheduled that day, and by the time one arrived, he was missing. His body was found later that day, July 15, in the

---

1. The superior court decision has been edited to conform with our technical rules.

1. Transcript of hearing [Tr.] at 71.

2. Exc. 1.

boat harbor.[3] While the medical examiner determined that he drowned, the manner of death is unknown.[4] His family argues that Excursion Inlet is a remote location, that he was waiting on an employer-provided flight out, that his death arose out of his employment and therefore should be presumed compensable.[5] The employer responds that he had already quit, was not on its premises when he disappeared, and that the remote site doctrine has been abrogated by statute.[6] The Board agreed with the employer, with one member dissenting.[7]

### Facts and circumstances.[8]

As with too many Alaska tragedies, exactly what happened will likely never be known. Mr. Ugale was Filipino, as were most of his co-workers, and at the time of his death, they were working sixteen-hour days.[9] He was married and had three children, two of whom are still under age eighteen.[10] While his wife said they were happy and he didn't suffer from any mental problems,[11] there is some conflicting information as to what was going on in the days and hours before he died. His brother Alfredo testified (in a Tagalog dialect, through an interpreter) that Antonio was being threatened by a co-worker named Edwin Pacada, that he was afraid to sleep in the bunkhouse his last night there; he allegedly told Esteban Echavarre that someone had threatened his brother's life.[12] Mr.

Echavarre recalled that when they spoke two days before he died, he seemed nervous and scared, and mentioned a problem with co-workers.[13] Mr. Ugale's supervisor, Melanio Ancheta, said that he heard that Mr. Ugale was afraid, although in general he did not seem to know why he quit his job in mid-season.[14] The separation notice prepared by the company listed the reason for leaving as "Family problem and I can't sleep well during at [sic] night and feel a[sic] nervous."[15] The personnel manager, Mr. Henricus, confirmed this impression in his testimony.[16]

Like the foreman, Mr. Henricus didn't seem to know exactly what to make of Mr. Ugale's demeanor. He recalled that he kept repeating himself and shaking hands, and "I kind of felt he was not in, you know, his best senses really."[17] The company nurse, who saw Mr. Ugale a week before he died, also couldn't really tell us what was wrong with him, advising him at the time to try to get some sleep,[18] but she also reported that Alfredo Ugale came to her concerned about his brother, saying he was "sick in the head."[19] The Trooper's report,[20] however, based on interviews, referred to Mr. Ugale as depressed and despondent, and the overall impression suggested paranoia; the family argues that this was based entirely on lay reports from company employees.[21]

In any event, Alfredo Ugale decided to accompany his brother on the trip home,[22]

3. Exc. 144.

4. Exc. 11–12.

5. Appellant's Brief, filed 5/15/02 [At. Br.]; Reply, filed 8/12/02 [R. Br.].

6. Brief of Appellees, filed 7/15/02 [Ae. Br.].

7. Final Decision and Order, AWCB Case No. 199919457, Decision No. 01–247, 12/7/01; Exc. 227–250.

8. See also AWCB decision, Exc. 228–243.

9. Deposition of Melanio Ancheta at 23.

10. Testimony of Reyne Ugale, Exc. 40–41, 31.

11. Exc. 43–48, 228–29; Tr. 102.

12. Exc. 4–6, 25, 27–28, 69, 77, 219, 223.

13. Exc. 3, 8–10, 75–81. See also Exc. 69, 231–33; Tr. 99.

14. Exc. 71–72; Melanio Ancheta Depo., 10/15/01; Exc. 229.

15. Exc. 138, 230.

16. Tr. 153; Exc. 229.

17. Tr. 154, 158–59; Exc. 229–30.

18. Tr. 178.

19. Tr. 179, 186.

20. Exc. 143–77.

21. R. Br. 9. See Tr. 90.

22. Ugale Depo. 22–23; Exc. 200.

and Mr. Henricus made the necessary travel arrangements.[23] He couldn't get them on a flight to Juneau that evening, and so arranged an early morning departure on July 15, connecting to flights to California.[24] They signed the separation documents, and received their pay, $300 of which was in cash.[25] It was company policy to feed and house anyone still at its facility, given the location.[26] That evening both brothers went to a place known as "Filipino Plaza," a gathering place on the beach commonly used by Excursion Inlet Packing Company ("XIP") employees.[27] After about fifteen minutes, Alfredo left.[28]

From this point forward, the facts become increasingly murky. Redacted police reports [29] were stipulated into evidence,[30] and Trooper Welch wrote that Alfredo saw his brother leave,[31] even though Alfredo insists that he himself had already gone home.[32] He further testified that he got out of bed to search after some people unknown to him told him that Antonio was missing.[33] David McLean, XIP's assistant superintendent and office manager, testified that Melanio Ancheta told him that he [Ancheta] and Alfredo Ugale were present at Filipino Plaza and ran after the decedent as he left the gathering,[34] but this was flatly contradicted by the testimony of both other men.[35] To some extent this might have been attributable to translat-

ing difficulties.[36] The Trooper also testified before the Board as to the lay of the land, the way the tide and current flowed, and other factors that might have played a part in Mr. Ugale's death.[37]

The next report we have of Mr. Ugale was when his body was found in the boat harbor.[38] His wedding ring and the $300 were not found.[39] His body was scraped and bruised in several places,[40] and the cause of death was asphyxiation due to drowning in salt water.[41] For a variety of reasons, Trooper Welch concluded that Mr. Ugale tried to cross the river and was swept downstream, and later flowed back up with the tide.[42] The medical examiner, apparently relying on information obtained from the Troopers,[43] reported previous psychiatric disorder, a previous threat of suicide and behavior consistent with this; he commented that "it looks more like a suicide than anything else." [44] A psychologist called by the family who had reviewed a portion of the record testified to the contrary—that an ability to work eighteen hours a day, no previous attempts, attendance at the gathering the night of July 14, a previously active life—did not lead him to the conclusion that Mr. Ugale had taken his own life.[45] The employer challenges this testimony as based on very limited and incomplete portions of the record.[46]

23. Tr. 157.

24. Tr. 158, Exc. 142.

25. Exc. 2–3, 23–25, 139; Tr. 105, 156.

26. Exc. 93.

27. Exc. 18–22, 26, 84–92; Tr. 109, 133–34.

28. Exc. 220–21.

29. Trooper Welch testified as to the names blacked out in the reports. Tr. 77–79, 82.

30. Tr. 14; Exc. 143–77.

31. Exc. 150A; Tr. 74, 85–86.

32. Exc. 220–22.

33. Ugale Depo. 33–34.

34. Tr. 126–27.

35. Ancheta Depo. 21, 24; Exc. 220–22.

36. Tr. 89, 106.

37. Tr. 93–99, 110–12, 116–18.

38. Exc. 17, 144.

39. Exc. 17, 25, 29, 149.

40. Exc. 144, 149–50, 164, 179, 182; Tr. 72.

41. Exc. 11–12.

42. Tr. 102, 113.

43. *See* Exc. 69.

44. Exc. 13.

45. Exc. 48–69.

46. Ae. Br. 12.

**The Decision by the Board.**

The Board's discussion of the facts is more detailed than those set out here, and relies heavily on Trooper Welch's synopsis and interviews.[47] But in the end, it did not feel the need to answer the unanswerable questions posed by Mr. Ugale's death. Instead it found that (1) the employee had clearly resigned his job at the time of his death, but (2) was allowed to stay at the site until transportation was available, which "may extend the employee/employer relationship."[48] It further found that (3) the death did not occur at the XIP plant or property owned by it,[49] nor was Mr. Ugale engaged in travel from the site or other activities under XIP's direction, control or sponsorship.[50] It also found that (4) Mr. Ugale was last seen running away from Filipino Plaza, and it found that all of this constituted substantial evidence to rebut the presumption of compensability and shift the burden to the family to prove its claim by a preponderance of the evidence.[51]

Further examining the evidence, the Board found that Mr. Ugale was engaging in personal activities. It did not find evidence of foul play, rejecting Alfredo Ugale's testimony suggesting the contrary, and concluded that whether accident or suicide, it was not caused by the employer. Accordingly, the Board concluded that Mr. Ugale did not die in the course or scope of his employment,[52] and so denied the family's claim for benefits.[53]

47. Exc. 239–43.

48. Exc. 245.

49. *Id.*

50. Exc. 244.

51. Exc. 245–46.

52. AS 23.20.395(2).

53. Exc. 246–47.

54. Exc. 248–49.

55. Ms. Lawlor cites *Fireman's Fund American Insurance Cos. v. Gomes,* 544 P.2d 1013 (Alaska 1976), and *Kelly v. Nelbro Packing Co.,* 3AN–00–3682 CI (Alaska Super.8/17/00), Exc. 187–95.

Board member Harriett Lawlor dissented, accepting Alfredo Ugale's testimony and reasoning that the decedent's wedding band must have been removed before he drowned. She found that his actions in the days and hours before his death, and the fact that his wallet, the $300, and his ring were never recovered, added up to the conclusion that he was probably murdered.[54] She applied the remote site doctrine, and concluded that waiting for his flight out was within the scope of his employment and therefore compensable.[55]

**Standard of review.**

The parties addressed the applicable standards of review in their briefs.[56] Factual determinations of the Board are to be sustained if supported by substantial evidence, which is such evidence as a reasonable person might accept as adequate to support a conclusion.[57] I am not to re-weigh the evidence, nor to choose between competing inferences, but just to decide whether a reasonable mind could accept the findings in light of the entire record.[58] If I can't conscientiously find that the evidence is substantial, after reviewing the record, then I may set aside the finding.[59]

Where the Board interprets its regulations or otherwise applies its expertise to an issue of law, the reasonable basis is used;[60] otherwise, I am to substitute my judgment for the Board's and adopt the rule of law that is

56. At. Br. vi; Ae. Br. 15–16.

57. *Miller v. ITT Arctic Servs.,* 577 P.2d 1044, 1046 (Alaska 1978). *See also Yahara v. Construction & Rigging, Inc.,* 851 P.2d 69, 72 (Alaska 1993), and *Resler v. Universal Servs., Inc.,* 778 P.2d 1146, 1149 (Alaska 1989).

58. *Doyon Universal Servs. v. Allen,* 999 P.2d 764, 771 (Alaska 2000).

59. *Fairbanks North Star Borough v. Rogers and Babler,* 747 P.2d 528, 534 (Alaska 1987) (citing *Delaney v. Alaska Airlines,* 693 P.2d 859, 863–64 n. 2 (Alaska 1985)).

60. *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.,* 746 P.2d 896, 903 (Alaska 1987). *See also Williams v. Abood Sweeping Co.,* 53 P.3d 134, 139 (Alaska 2002).

most persuasive in light of precedent, reason and policy.[61]

## The presumption of compensability.

While Ugale at one point says that the Board failed to apply the presumption of compensability,[62] his actual argument is that it was applied incorrectly.[63] Alaska Statute 23.30.120(a)(1) establishes a presumption that a claim for compensation falls within the provisions of the Alaska Workers' Compensation Act in the absence of substantial evidence to the contrary.

Before the presumption attaches, some preliminary link must be established between a claimant's disability and his employment. *Burgess Construction Co. v. Smallwood*, 623 P.2d 312, 316 (Alaska 1981). "The purpose of the preliminary link requirement is to 'rule out cases in which [the] claimant can show neither that the injury occurred in the course of employment nor that it arose out of [it].' " *Cheeks v. Wismer & Becker/G.S. Atkinson*, 742 P.2d 239, 244 (Alaska 1987) (quoting 1A Larson, The Law of Workman's Compensation § 10.33, at 121 (1978)).

. . .

In making its preliminary link determination, the Board need not concern itself with the witnesses' credibility.[64]

The Board, citing *Meek v. Unocal Corporation*,[65] seized upon the italicized word *any* by the Alaska Supreme Court,[*] and said that this meant it had to apply the presumption in this case. While it doesn't appear to me that the court was changing its position in *Meek*, it was making clear that the presumption is not restricted to whether or not the claim is work-related. In this case, the Board stated that "[b]ased upon the testimony and claim he died in the course and scope of his work, we must . . . apply the presumption."[66] It further found that the employer allowed Mr. Ugale to stay overnight until transportation from the site was available, and so analyzed the claim as if he were still an employee.[67] As discussed earlier, it then went on to find the evidence sufficient to rebut the presumption and denied benefits.

The employer continues to argue[68] that the Board should not have applied the presumption in the first place, citing *Sokolowski v. Best Western Golden Lion Hotel*, which seems especially misplaced in light of the ultimate reversal of that decision.[69] The problem may be that the concept of a presumption "dropping out" upon the introduction of evidence to the contrary[70] is difficult for some of us to comprehend. Perhaps the presumption is only useful in a certain class of cases.[71] And that may be true here—unless I were to conclude that the evidence introduced by the employer to rebut the presumption is not substantial as a matter of law. And this is exactly what the family in its reply argues that I should conclude.

They argue this in two ways. One of these[72] looks directly at AS 23.30.120(a)(4) and asks whether the employer introduced substantial evidence that Mr. Ugale intended to kill or injure himself. The other[73] looks at section .120(a)(1) and argues more generally that there was not substantial evidence that the death did not come under the provisions of the Act.

---

**61.** *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979), *Yahara*, 851 P.2d at 72.

**62.** At. Br. vii, 13.

**63.** R. Br. 12–15.

**64.** *Resler*, 778 P.2d at 1148–49.

**65.** 914 P.2d 1276, 1279 (Alaska 1996).

\* [*Id.* at 1279 (quoting *Municipality of Anchorage v. Carter*, 818 P.2d 661, 665 (Alaska 1991)).]

**66.** Exc. 246.

**67.** *Id.*

**68.** Ae. Br. 21.

**69.** AWCB Decision No. 90–0684 (June 15, 1989), *rev'd Sokolowski v. Best Western*, 813 P.2d 286 (Alaska 1991), Exc. 102–9.

**70.** *Anchorage Roofing Co. v. Gonzales*, 507 P.2d 501, 504 (Alaska 1973).

**71.** *See* J. Larson and J. Lewis, *The Alaska Workers' Compensation Law: Fact–Finding, Appellate Review and the Presumption of Compensibility*, 2 Alaska L.Rev. 1, 9–11 (1985).

**72.** R. Br. 16.

**73.** R. Br. 11–15.

I discussed "substantial evidence" briefly earlier when I addressed the standard of review, and Mr. Ugale's family doesn't argue that it means anything different here. There are cases that complicate this issue somewhat, and some are discussed in the 1985 law review article referenced above.[74] But these cases say that whether the quantum of evidence admitted is substantial is itself a legal question,[75] and that the mere possibility of a nonqualifying alternative is not substantial evidence sufficient to overcome the presumption.[76]

*Miller v. ITT Arctic Services* explained that the presumption could be overcome either by affirmative evidence showing that the death was not work-connected or by eliminating all reasonable possibilities that it was.[77] In *Sokolowski* the court held that the Board erred in allowing the employer to overcome the presumption by proof that the injury occurred off premises when the special hazard exception applied; proceeding in this manner essentially took the presumption out of the picture in this type of case.[78] A careful reading of cases such as *Sokolowski, Tolbert v. Alascom* and *DeYounge v. Nana/Marriott,*[79] teaches that while the Board is indeed the fact-finder, a reviewing court needs to carefully examine the evidence that it relied upon, making sure that it was not speculative, that it does not elevate mere possibilities and that it actually excludes work-related factors as a substantial cause. It is with these thoughts in mind that I return to the case at hand.

## Was there substantial evidence to rebut the presumption?

XIP argues [80] that the Board found [81] that Mr. Ugale died while engaged in personal activities away from its property, and that this finding is supported by substantial evidence. But of course the Board also found that Mr. Ugale had to wait for a plane out and that he still had a bunk at the XIP facility. If the "remote site" doctrine is applicable, then this case is like *Sokolowski,* and reliance upon evidence that the injury occurred off premises would be error as a matter of law. The evidence was uncontested that Mr. Ugale was scared to stay in the bunkhouse, that he wanted to leave, that he couldn't get a plane until the next day, that he left, and that he died. Under these circumstances, the fact that he died after quitting his job and the fact that he died off XIP premises are both simply irrelevant.

Only in Alaska could it be argued [82] that XIP's facility was not a remote site. In most states, Hoonah—twenty-five miles away— would be remote enough. Outside of Ward's Cove, which owns XIP, there are a few people who own land there,[83] a dozen of whom might stay through the winter, a mail plane on Wednesdays, a store open on Thursdays,[84] a runway that doubles as Main Street,[85] no hotel, no restaurant, no government, virtually no public facilities. There certainly is no question that under a line of decisions in this area,[86] this tiny community would be one in which the remote site doctrine applied:

74. Larson, *supra,* note 71.

75. *Miller v. ITT Arctic Servs.,* 577 P.2d 1044, 1046 (Alaska 1978).

76. *Hoth v. Valley Constr.* 671 P.2d 871, 874 (Alaska 1983) ("little more than speculation" offered).

77. 577 P.2d at 1046; *see also Steffey v. Mun. of Anchorage,* 1 P.3d 685, 690 (Alaska 2000); *Tolbert v. Alascom, Inc.,* 973 P.2d 603, 611 (Alaska 1999).

78. 813 P.2d 286, 292 (Alaska 1991).

79. 1 P.3d 90 (Alaska 2000).

80. Ae. Br. 20.

81. Exc. 245–46.

82. Ae. Br. 1–2, 17, 34.

83. Exc. 82.

84. Ae. Br. 34.

85. Tr. 115.

86. *Anderson v. Employers Liability Assurance Corp.,* 498 P.2d 288 (Alaska 1972) (employer's bar in Amchitka), *State, Dep't of Highways v. Johns,* 422 P.2d 855 (Alaska 1967) (commuting to mile 57 Richardson Highway), *Northern Corp. v. Saari,* 409 P.2d 845 (Alaska 1966) (commuting to adjacent recreational activity); *M–K Rivers v. Schleifman,* 599 P.2d 132 (Alaska 1979) (30 mile

Although it is often possible for a resident employee in a civilized community to leave his work and residential premises to pursue an entirely personal whim and thereby remove himself from work-connected coverage, the worker at a remote area may not so easily leave his job site behind.[87]

So it was with Mr. Ugale; he couldn't easily leave his job site behind him.[88]

The Board, however, noted the amendments to its Act after these cases were decided, and cited its own precedent restricting coverage to only those activities specified in AS 23.30.395(2).[89] What that statute does is affirm the court decisions on travel to and from a remote site, while excluding recreational league activities and "activities of a personal nature away from the job site."[90] *Norcon, Inc. v. Alaska Workers' Compensation Board* is not on point because the decedent died while getting ready for work in a camp five miles from Valdez; the court simply said that there was nothing about this activity that was influenced by the alleged remoteness of the job site.[91] Similarly, while the Board discussed the 1980 amendments in *Andress*,[92] its decision was based on a wholly separate rationale, and in *Snyder*,[93] the Board relied upon the first part of AS 23.30.395(2) to find the injury to be compensable.

The same is true of the decision in *Kelly v. Nelbro Packing Company.*[94] Section .395(2) simply does not provide the answer when the question is itself whether a certain activity, conducted as a result of one's job at a remote job site, is personal or not. Judge Bolger found that a trip to the Pioneer Bar in Sitka was "reasonably foreseeable and incidental"[95] to one's employment on a herring tender; you have to cross the docks late at night if you are to enjoy a meal in town.

The question that remains in this case is whether there was substantial evidence that Mr. Ugale was engaged in activities of a personal nature at the time of his death. Since we are at the stage where we are trying to decide if the presumption has been overcome, the Board was not supposed to get into credibility,[96] nor is the mere possibility of a nonqualifying alternative sufficient.[97] It is apparent that the suggestion that Mr. Ugale took his own life falls into this latter category, since there is no direct evidence of it and it is inconsistent with many of the facts that have been established.

More difficult is the question of whether substantial evidence was presented to show that the death was not work-connected, or eliminating all reasonable possibilities that it was.[98] The Board found that the record was "clear and consistent"[99] that Mr. Ugale was last seen alive running away from Filipino Plaza, but in fact no one testified to this and the two who allegedly reported it flatly denied being present. If he were in fact running away, why he might be doing so is also unclear. Further, the Board's finding that he was attending a going-away party[100] may

commute to Glennallen to cash paycheck); Exc. 243–44.

**87.** *Anderson*, 498 P.2d at 290.

**88.** *See also* Board decisions cited at R. Br 3–5.

**89.** Exc. 244, citing *Gerwer v. Alaska Marine Highway*, AWCB Decision No. 87–133 (June 12, 1987).

**90.** *See also* the legislative history cited at Ae. Br. 32–33 and *ARCO Alaska, Inc. v. Reynolds*, No. 3AN–88–8396 CI (Alaska Super. June 26, 1990), Exc. 110–26.

**91.** 880 P.2d 1051, 1053 n. 1 (Alaska 1994).

**92.** *Andress v. Eagle Nest Enters.*, AWCB Decision No. 91–26 (February 1, 1991), Exc. 127–135.

**93.** *Snyder v. Alaska United Drilling, Inc.*, AWCB Decision No. 89–103 (May 4, 1989), Exc. 98–101.

**94.** 3AN–00–3682 CI (Alaska Super.8/17/00).

**95.** *Witmer v. Kellen*, 884 P.2d 662, 665 (Alaska 1994).

**96.** *Norcon*, 880 P.2d at 1054.

**97.** *Hoth v. Valley Constr.*, 671 P.2d 871, 874 (Alaska 1983).

**98.** *See* note 77.

**99.** Exc. 245.

**100.** Exc. 246.

be true, but he didn't die at that party or as a result of it. And the finding that "if he slipped and fell on the beach ... he would have been engaged in an activity of personal nature"[101] is simply conclusory; the nature of his actions is itself the question, and the employer had to present substantial evidence to overcome the presumption. The Board's rejection of Alfredo Ugale's testimony[102] is improper at this stage as well.[103] Finally, this is not a case of an assault with purely personal motives,[104] since the source of the fear was alleged to be a co-worker, and it was Mr. Ugale's inability to leave that provides the primary link to his employment. I therefore conclude that the employer failed to rebut the presumption by substantial evidence, so that Mr. Ugale's family is entitled to compensation.

We know that Mr. Ugale was frightened, that he wanted to leave Excursion Inlet and that due to its remoteness, he couldn't get a plane out until July 15th. This latter circumstance makes irrelevant the fact that the death took place off XIP property and after he had quit his job. He was afraid to stay in his room, there was evidence that his fear was of a co-worker, and when his body was found, his wedding ring and cash were gone. His wife reported no family difficulty or mental health problem, and Dr. Reffner testified that the history did not indicate a likely suicide. While this is not an easy matter to analyze, I agree with Ms. Lawlor's dissent[105] that, as in *Fireman's Fund American Insurance Cos. v. Gomes*,[106] there is insufficient evidence to rebut the presumption of compensability. The decision of the Board is reversed and the matter remanded to the Board for determination of the amount of benefits due. Appellant is awarded costs and attorney fees of $750.

Dated: 9/5/02

/s/ Fred Torrisi, Judge

101. *Id.*

102. *Id.*

103. *See Norcon*, 880 P.2d at 1054.

104. *See Temple v. Denali Princess Lodge*, 21 P.3d 813 (Alaska 2001).

105. Exc. 249.

106. 544 P.2d 1013 (Alaska 1976).